**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BARBARA J. STEVENS, ) | |
| ) | No. 14 CV 201 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner, Social Security ) | |
| Administration, ) | |
| ) | April 15, 2016 |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Barbara Stevens filed concurrent applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") alleging that she is disabled because of diabetes, fibromyalgia, depression, anxiety, and arthritis. After the Commissioner of the Social Security Administration denied her applications, Stevens filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Stevens's motion for summary judgment is granted, the government's is denied, and the matter is remanded for further proceedings:

**Procedural History**

Stevens filed concurrent DIB and SSI applications on April 4, 2011, alleging a disability onset date of October 13, 2010, because of diabetes, fibromyalgia, depression, anxiety, and arthritis. (Administrative Record ("A.R.") 164-77.) Her claims were denied initially and on reconsideration. (Id. at 81-84.) Stevens

requested and was granted a hearing before an Administrative Law Judge ("ALJ"), which took place on September 26, 2012. (Id. at 35-80, 121-22.) On October 18, 2012, the ALJ issued a decision finding that Stevens is not disabled and thus not entitled to DIB or SSI benefits. (Id. at 13-23.) When the Appeals Council denied review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Stevens then filed this action seeking judicial review. (R. 1); s*ee* 42 U.S.C. § 405(g). The parties consented to this court's jurisdiction. (R. 7); s*ee* 28 U.S.C. § 636(c).

**Background**

Stevens has a history of working in nursing homes, first as a psychosocial aid and most recently as a part-time desk attendant and dining room attendant. She stopped working in March 2012 when she developed an infection in her foot that required surgery. At her hearing before the ALJ, Stevens presented both documentary and testimonial evidence in support of her claim that a combination of her diabetes, depression, anxiety, fibromyalgia, obesity, and arthritis have left her unable to return to work.

**A.     Medical Evidence**

The medical record, which begins in October 2009, shows that Dr. Mark Wargo provided Stevens with treatment on an ongoing basis for her type 2 diabetes, hyperlipidemia, and hypertension. (A.R. 271.) Stevens is 5'4" tall and her weight during her treatment relationship with Dr. Wargo ranged from 236 to 265 pounds,

meaning her BMI ranged from 40.5 to 44.78.[1] (Id. at 451, 465.) Throughout their relationship Dr. Wargo counseled Stevens on her weight, noted her history of obesity, and prescribed medications to try to control her diabetes and treat her hyperlipidemia and hypertension. (See, e.g., id. at 282, 294, 306, 471.) He also prescribed Stevens medications to counteract anxiety and monitored her treatment for sleep apnea. (Id. at 306, 472.) Dr. Wargo did not provide any opinion as to how Stevens's medical problems impact her ability to function on a day-to-day basis.

Other than Stevens's on-going treatment with Dr. Wargo, the medical record reveals two episodes of increased treatment: the first stemming from a shoulder injury and the second related to a diabetes-related infection. Stevens injured her right shoulder in April 2010 when she fell. (Id. at 290.) Dr. Wargo referred her to Dr. John Speca, an orthopedist, who diagnosed her as having right shoulder impingement syndrome. (Id. at 390.) Dr. Speca wrote that Stevens could return to work as long as she wore her arm in a sling. (Id.) When Stevens continued to have pain in her right shoulder, Dr. Speca performed a shoulder manipulation. (Id. at 381.) Two weeks after the procedure Stevens still suffered from shoulder pain, but her passive range of motion in her shoulder had improved significantly. (Id. at 378.) There are no treatment notes related to her shoulder after August 2010.

The second period of stepped-up medical treatment began in February 2012, when Stevens complained of pain in her left foot. (Id. at 497.) Stevens reported to

---

[1] Social Security Ruling 02-1p describes "BMIs greater than or equal to 40" as qualifying as "extreme" obesity and "representing the greatest risk for developing obesity-related impairments." SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002).

3

Dr. Wargo in March 2012 that she had a painful open area on her left heel that had persisted for a few weeks. (Id. at 464.) Dr. Wargo prescribed an antibiotic and referred her to a podiatrist, but Stevens reported that she could not afford to see a podiatrist. (Id.) Later that month she underwent an operation involving debridement of her left third toe and heel. (Id. at 522.) Three months later in June 2012 Stevens had to undergo a partial amputation of her third left toe. (Id. at 505, 509-10.) The doctor who served as a surgical consultant noted that Stevens's uncontrolled diabetes and vascular insufficiency made it difficult for her wounds to heal. (Id. at 509.) Stevens was discharged from the hospital after arrangements were made for her to have a vascular consult. (Id. at 514.)

**B.    Stevens's Hearing Testimony**

At her September 2012 hearing before the ALJ, which took place three months after her partial toe amputation, Stevens testified that her "primary complaint" is her foot, because she said the amputation impacts her balance and her ability to walk. (A.R. 47.) Stevens said that she also experiences pain in her left foot that typically is at a level of two out of ten but that sometimes spikes to a four or six. (Id. at 47-48.) Stevens testified that she had been prescribed Vicodin and Tramadol to reduce her pain but because they bother her stomach she takes over-the-counter pain medicine instead. (Id. at 49.) She said that her second most pressing complaint stems from her insulin-dependent diabetes, which causes neuropathy in her hands and feet. (Id.) She testified that her varying blood sugar levels have also caused her to experience blurry vision. (Id. at 51.) Stevens testified

4

that her health problems make it difficult for her to walk more than a block or to stand for more than 10 or 15 minutes at a time. (Id. at 51-52.) She also said that because of pain in her hips and back she is unable to sit for more than 15 minutes or so and that fibromyalgia produces pain in her shoulders, hands, arms, legs, and neck. (Id. at 52, 54.)

When the ALJ asked why she stopped working in her most recent nursing home job, Stevens first said that she was unable to work so she "had to leave there," and that she "decided to leave" because her foot infection rendered her unable to be around other people. (Id. at 44-45.) During follow-up questioning from her attorney, Stevens said it was correct to say that she was "terminated" from her job. (Id. at 57.) She explained that she developed MRSA, which prevented her from working around elderly people. (Id.) She said that during her last job she missed work 10 to 12 times a month and would find replacements to fill in for her. (Id. at 58.) When asked whether she believed she could perform any job in the future, Stevens said she did not think so because although "there would be weeks that I could maybe get to work every day," there would also be days that she would "find it very difficult to get out of bed." (Id. at 62.)

## C. Vocational Expert's Testimony

Vocational expert ("VE") Julie Bose also testified at the hearing and provided her opinion with respect to the kinds of jobs a person with certain hypothetical limitations could perform. The ALJ asked the VE to consider a hypothetical person limited to sedentary work with additional limitations to occasional balancing and

climbing of ladders, ropes, or scaffolds, frequent climbing of ramps or stairs, stooping, crouching, kneeling, and crawling, with a mandate to avoid concentrated exposure to temperature extremes, moving machinery, and unprotected heights, and with additional limitations to only occasional interaction with the public and to avoid carrying out more than detailed instructions. (A.R. 70-71.) The VE testified that such a person could perform several jobs present in the regional or national economy in significant numbers, including document preparer, addresser, and circuit board assembler. (Id. at 71.) But when asked to assume a person could not engage in sustained work activity on a regular and continuing basis for the equivalent of a 40-hour work week, the VE testified that such a restriction would rule out all work. (Id. at 71.) The VE testified that employers customarily accept only 10 to 14 absences per year. (Id.)

**D.     The ALJ's Decision**

The ALJ evaluated Stevens's claims under the required five-step evaluation process for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a) & 416.920(a). At steps one and two the ALJ determined that Stevens had not engaged in substantial gainful activity since her alleged onset date and that her fibromyalgia, diabetes, peripheral neuropathy, osteoarthritis, obesity, peripheral artery disease, sleep apnea, hypertension, dysthymia, and anxiety disorder all constitute severe impairments. (A.R. 15.) At step three the ALJ determined that none of Stevens's impairments meet or medically equal any listed impairment. (Id. at 16.) Before turning to step four, the ALJ assessed Stevens as

6

having the residual functional capacity ("RFC") to perform sedentary work with limited restrictions in climbing and balancing, and with limits on exposure to hazards, unprotected heights, and interaction with the public. (Id. at 18.) In so finding, the ALJ explained that he found Stevens's description of her symptoms to be less than fully credible and that he gave some weight to a state consulting physician who opined that Stevens can perform light work. (Id. at 20-21.) The ALJ assigned Stevens to sedentary (rather than light) work based on her relatively recent foot surgery and balancing difficulties. (Id. at 21.) At step four the ALJ determined that Stevens could not perform her past relevant work as a psychosocial aid, but at step five he concluded that she can perform other jobs that exist in significant numbers in the national economy. (Id. at 22-23.) Accordingly, the ALJ concluded that Stevens is not disabled and therefore not entitled to DIB or SSI. (Id. at 23.)

## Analysis

In challenging the ALJ's decision Stevens argues that the ALJ erred in assessing her credibility and in considering the combined impact of her obesity and her other impairments. (R. 15, Pl.'s Mem. at 12-17.) Stevens also asserts that the ALJ failed to account for her likely rate of absenteeism in concluding that she is able to work full-time. (Id. at 12-13.) This court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence. *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate

7

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). But the court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether the applicant is disabled," *see Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Stevens's strongest argument is her assertion that the ALJ failed to account for the impact of her obesity in combination with her other impairments. Stevens first frames this argument in terms of whether the ALJ properly considered the impact of her obesity at step three in evaluating her impairments under the listings. In her opening brief Stevens discusses the criteria of former Listing 9.09 and seems to suggest that the ALJ should have evaluated whether her condition meets or medically equals that Listing. (R. 15, Pl.'s Mem. at 13-14.) Because the SSA deleted Listing 9.09 from the listed impairments in 20 C.F.R, subpart P, appendix 1 in 1999, *see* SSR 02-1p, 2002 WL 34686281, at *1, that argument merits no discussion. And because Stevens has not identified any other listing that her impairments or combination of impairments meet or medically equal, she has not shown that the ALJ erred in evaluating her impairments at step three. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (noting that claimant bears burden of showing impairments meet all criteria of listed impairment); *Knox v.*

*Astrue*, 327 Fed. App'x 652, 655 (7th Cir. 2009) (finding no reversible step-three error where claimant did not point to medical evidence showing he met all criteria of any listed impairment). In fact in her reply brief Stevens concedes as much, stating that "[i]t is true claimant did not meet the specific medical criteria for any medical condition to terminate the five-step inquiry at step three." (R. 21, Pl.'s Reply at 3.) Accordingly, Stevens has not shown that the ALJ committed any error at step three of the required analysis.

Stevens gains traction when she frames her argument in terms of whether the ALJ failed to adequately consider the impact of her obesity in combination with her other impairments in assessing her RFC. Where the claimant suffers from obesity, the ALJ must "consider the effects of obesity together with the underlying impairments." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). That is because "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p, 2002 WL 34686281, at *6. But in some cases an ALJ's failure to explicitly discuss the impact of obesity may be harmless. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Specifically, where the ALJ adopts the limitations suggested by doctors who were aware of or discussed the condition, the court can conclude that the ALJ implicitly considered the impact of obesity by adopting the limitations they imposed. *See id.*; *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). In those situations, and where the claimant has not outlined how obesity further impairs her ability to work, an ALJ's error in failing to consider the impact of obesity can be harmless. *See Prochaska*,

454 F.3d at 736-37; *see also Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013) (finding failure to analyze obesity harmless where ALJ referenced doctors' notes that recorded obesity and where claimant failed "to specify how her obesity further impaired her ability to work").

Here, although the ALJ acknowledged Stevens's weight at several points in his decision, he did not engage in any explicit discussion of how her obesity interacts with her other impairments. In the course of his decision, the ALJ found Stevens's obesity to be a severe impairment, wrote that he gave consideration "to the claimant's obesity in accordance with SSR 02-01p," and said that he considered her non-severe impairments "singly and in combination with the claimant's severe impairments," which include obesity. (A.R. 15-16, 18-20.) The ALJ also identified Stevens's testimony and the consulting examiner's report as listing her height and weight. (Id. at 18-19.) He ultimately assigned Stevens an RFC limiting her to sedentary work, which is more restrictive than that assigned by the only doctor who weighed in on the RFC question and who found her capable of performing light work. But Stevens is correct that beyond those comments, the ALJ did not wrestle with how Stevens's obesity would impact her other impairments, including osteoarthritis.

Because Stevens has done little here to highlight any medical evidence showing that her obesity impacts her ability to function beyond the assigned RFC, at first blush this case might easily fall into the branch of Seventh Circuit decisions finding harmless an ALJ's failure to grapple explicitly with the combined impact of

10

obesity and other impairments. *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015); *Pepper*, 712 F.3d at 365; *Skarbek*, 390 F.3d at 504. But because in recent cases the Seventh Circuit has shown a disinclination toward finding harmless error when the claimant has extreme obesity, this case presents a closer call. For example, in *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014), the Seventh Circuit remanded a case where the ALJ gave "meager attention" to the claimant's morbid obesity and assigned an RFC for medium work, including standing or walking for six hours in an eight-hour day. *Id.* at 681-82. There the Court made clear that it would not overlook an ALJ's failure to consider how morbid obesity would aggravate a claimant's pain and numbness, *id.* at 681, conditions that the ALJ recognized as being among Stevens's symptoms. Moreover, in *Goins* the Court characterized as laughable the idea that an ALJ can accommodate a claimant's morbid obesity by assigning the kinds of limitations to crawling and crouching that the ALJ assigned here. *Id.* at 682 (expressing doubt that someone with a BMI near 40 could "even occasionally" crawl, stoop, and crouch).

Similarly, in *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), the Court reversed an ALJ's decision after criticizing his failure to consider the bearing of the claimant's near-morbid obesity on her ability to work. *Id.* at 706. The Court emphasized that limiting the claimant to sedentary work does not necessarily accommodate morbid obesity, which can interfere with the ability to sit for long periods of time, as normally required for sedentary work. *Id.* at 707. The Seventh Circuit stated that in light of the "sufficiently obvious" difficulties that a morbidly

11

obese person would have with prolonged sitting, the ALJ should have instructed "the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work." *Id.* It was not enough that the ALJ acknowledged that the plaintiff's obesity factored into her leg pain; the ALJ erred by failing "to discuss its bearing on her ability to do sedentary work." *Id.*

As in *Browning*, here the ALJ did little more than acknowledge Stevens's obesity, and the consulting physician did not even do that. There is no indication in the consulting physician's RFC that he took into account Stevens's extreme obesity in opining that she can perform light work. Although he reviewed her medical record, which is peppered with references to her weight and history of obesity, nothing in the consulting physician's narrative discussion of the RFC references her weight or provides any indication that he considered the impact of her extreme obesity. (A.R. 348-55.) Moreover, the consulting physician's decision predates Stevens's toe amputation, and therefore provides no insight into how the attendant pain and balance problems stemming from that surgery would be exacerbated by her weight. The ALJ wrote that he accounted for the surgery by limiting Stevens to occasional balancing, but he did not explain how an extremely obese person with foot pain and balance issues would be able to "frequently climb ramps or stairs, stoop, crouch, kneel, and crawl." (A.R. 18.) The ALJ's failure to explain how Stevens's extreme obesity would affect her ability to perform sedentary work is particularly troubling in light of Stevens's testimony that she has trouble sitting for more than 15 minutes at a time. (A.R. 52.) Given all of these factors, the case must

12

be remanded for the ALJ to analyze how Stevens's extreme obesity interacts with her other impairments and how that interaction factors into her RFC. *See Browning*, 766 F.3d at 706-07.

Stevens's remaining arguments are confusing, and ultimately unavailing. For example, Stevens appears to challenge the ALJ's credibility assessment by stating that "[c]redibility should not be an issue in an assessment of the claimant's ability to be employed when considering the claimant's medical history." (R. 15, Pl.'s Mem. at 18.) That turns out to have been something of a prescient statement, given the new Social Security Ruling that went into effect on March 28, 2016, eliminating the term "credibility" from the ALJ's review of a claimant's symptoms. *See* SSR 16-3P, 2016 WL 1119029, at *1 (March 16, 2016) (superseding SSR 96-7p). But even under the new SSR, the ALJ is required to test the consistency of the claimant's statements in evaluating the severity of her symptoms, by weighing familiar factors such as the claimant's daily activities, medications, and treatment attempts. *Id.* at *7-*8. Because Stevens did not develop any discernible argument in her briefs as to how the ALJ erred in evaluating her statements, the court need not dwell longer here. *See Farrah v. Colvin*, 12 CV 50343, 2015 WL 1197421, at *3 (N.D. Ill. Mar. 16, 2015).

Lastly, Stevens argues that the ALJ erred in concluding at step five that Stevens can perform several jobs because, according to her, the VE opined that she is not employable in the national economy because she would not be able to work eight hours a day, five days a week, and would exceed an acceptable rate of

13

absenteeism. (R. 15, Pl.'s Mem. at 11-13.) But that argument mischaracterizes the VE's testimony. The VE describes the kinds of work a person with certain hypothetical limitations is able to perform. *See* 20 C.F.R. § 404.1560(b). Here, the VE testified that if a hypothetical person were absent 10-14 times a year, she would not be employable. (A.R. 71-72, 78.) She never testified, nor would she be qualified to testify, that Stevens' impairments would cause her to be absent from work at that rate. The ALJ was only required to include limitations in the RFC that he found supported by the record, *see Simila v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009); *Outlaw v. Astrue*, 412 Fed. App'x 894, 898 (7th Cir. 2011), and other than her own testimony, which the ALJ found to be inconsistent with the record, Stevens has not pointed to any evidence to support her assertion that she would be absent at a work-preclusive rate. Accordingly, Stevens has not shown that the ALJ committed any error at step five of the analysis.

## Conclusion

For the foregoing reasons, Stevens's motion for summary judgment is granted, the government's is denied, and the matter is remanded for further proceedings.

**ENTER:**

*/s/ Young B. Kim*
**Young B. Kim**
**United States Magistrate Judge**